1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JEROME SMITH,                          No.  1:21-cv-1395 DAD AC

12              Petitioner,

13        v.                                FINDINGS AND RECOMMENDATIONS

14   TAMMY FOSS, Warden,

15              Respondent.

16

17        Petitioner is a California state prisoner proceeding pro se with an application for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on Claims One, Two and Five

19   of the Second Amended Petition, ECF No. 27, which challenges petitioner's 2017 conviction for

20   murder and related offenses.  Respondent has answered.  ECF No. 41.  Petitioner did not file a

21   traverse and the time to do so has expired.

22                                BACKGROUND

23   I.        Proceedings in the Trial Court

24        A.  Overview

25        Petitioner was charged in Stanislaus County with first degree murder, arson, and related

26   offenses arising from a 2015 fire in a Modesto hotel room which killed a woman.  The case was

27   tried twice.  At the first trial in April 2016, the prosecutor pursued a premeditated murder theory;

28   the jury was not instructed on felony murder.  The jury found petitioner guilty of unlawful

                                          1

possession of a firearm but could not reach a verdict on the murder and arson charges. The vote on each count was 11 in favor of conviction and 1 in favor of acquittal. A mistrial was declared. Prior to the start of the second trial, which took place in November 2016, the prosecutor decided to withdraw the premeditation theory of first degree murder and proceed only on first degree felony-murder based on arson.

     B.  The Evidence Presented at the Second Trial

       1.  Overview of the Prosecution Case[1]

Sometime around 6:00 a.m. on November 14, 2015, firefighters and law enforcement officers responded to the Arrow Inn in Modesto because of a fire in room No. 108. The motel's manager reported the room had been rented by Valerie Villegas and petitioner. The motel's security cameras showed that petitioner and Villegas entered room No. 108 together over one hour before the fire. The cameras showed Villegas never left the room. No one else entered. After the fire started, the security cameras showed petitioner walk out of the room and stand in front of the door as smoke billowed out. Petitioner was the only person who left the room.

After the fire was extinguished, Villegas's body was found in room No. 108's bathroom. She had been hit in the back of the head three separate times with a blunt object. The autopsy showed that she was still alive, both when she was hit in the head, and when the fire started in the room. The cause of death was smoke inhalation.

When petitioner was later interviewed by a detective, he claimed that he did not know Villegas; that Villegas was never in his room; and that another woman, Anastasia Lee, who had been staying in the room next door, had entered the room and woken him up to alert him to the fire. These statements were refuted by the video from the motel's security cameras.

Fire Investigator Paul Spani testified that the burn patterns showed the fire had started inside Room 108. There was no evidence of any accidental cause of fire. Because the mattress

---

[1] The evidence relevant to petitioner's sufficiency of the evidence claim is set forth in greater detail below regarding Claim One. The transcripts of the second trial are contained in the Reporter's Transcript on Appeal, vol. 3 ("3 RT") at p. 528 through vol. 5 ("5 RT") at p. 1086 (ECF No. 39-8 at 190 through ECF No. 39-10 at 177). A detailed summary of the evidence is provided in the opinion of the California Court of Appeal, ECF No. 13-2 at pp. 3-29.

and boxspring were the most heavily damaged parts of the room and had burned the longest, the bed was likely the fire's area of origin.  The precise point of origin could not be determined.  The debris in the sleeping area included a bullet casing but no cigarette butts; cigarette filters do not burn even in a flashover.  No roach clip, pipe, or other drug smoking paraphernalia was found in the fire debris.  A "flashover" event had occurred, in which heat and smoke from the initial fire ran up and down the walls of the room and across the ceiling until the entire room became so hot that everything ignited all at once.  The bathroom exhibited heat and smoke damage, including blistered paint and melted plastic, but no fire damage.

On cross-examination, Investigator Spani said he had been unaware when he wrote his report that a package of filtered cigarettes and a lighter had been found in the bathroom.  He also did not know that Villegas had been seen entering Room 108 holding a lit cigarette before the fire.  He reiterated that if filtered cigarettes had been used to ignite the sheets or bed, the filters would have survived the fire.  The lighter could have been an ignition source used to set the fire in the sleeping area and then moved to the bathroom.

     2.  <u>Defense Case</u>

Petitioner did not testify.

Nikki Lavan testified that on the night of the fire she was staying in Room 109 of the Arrow Inn, next door to Room 108, with Anastasia Lee and a third woman.  Lee was a prostitute and petitioner's girlfriend.  She was angry at petitioner that night because he had left her at a convenience store and she had to walk back to the motel.  Lee had stood outside by Rooms 108 and 109 and shouted that she was going to "burn this mother[**]er down."

Dr. Avak Howsepian, a psychiatrist, testified in his expert opinion that a person with the quantity of methamphetamine in their system that was found in Villegas would likely suffer from methamphetamine intoxication, and possibly from psychosis or delirium.

C.  <u>Outcome</u>

The jury found petitioner guilty of the first degree murder of Villegas, based on a felony-murder theory, with the special circumstance that the murder was committed while defendant was engaged in the arson of an inhabited structure, and an enhancement for personal use of a firearm.

Petitioner was also convicted of arson of an inhabited structure.  He was sentenced on these counts together with the conviction from the first trial for unlawful possession of a firearm by a felon.  Petitioner was sentenced to life in prison without the possibility of parole on the murder count, plus a consecutive ten year term for the firearm enhancement.  Additional sentences on the other counts were imposed and stayed.

II.    Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on March 4, 2020.  ECF No. 13-2.  The California Supreme Court denied review on May 27, 2020.  ECF No. 13-4.

Petitioner filed a petition for writ of habeas corpus in the Superior Court of Stanislaus County on October 29, 2020, which was summarily denied the next day.  ECF Nos. 13-5, 13-6.  Petitioner filed another habeas petition in the superior court on May 18, 2021, which was summarily denied on May 24, 2021.  ECF Nos. 13-7, 13-8.

The original federal habeas petition was docketed on September 10, 2021, together with a motion for a stay pending exhaustion.  ECF Nos. 1, 2.  The petition was administratively stayed on December 8, 2021, ECF No. 16, and petitioner filed an exhaustion petition in the California Supreme Court on January 13, 2022, ECF No. 29-1.  The California Supreme Court denied the petition on May 18, 2022, with citation to People v. Duvall, 9 Cal. 4th 464, 474 (1995) and In re Swain, 34 Cal. 2d 300, 304 (1949).  ECF No. 29-2.[2]  Petitioner filed his second amended federal petition, together with a motion to lift the stay, in June 2022.  ECF Nos. 22, 27.

The stay was lifted on February 6, 2024, ECF No. 26,[3] and the case proceeded on the basis of the Second Amended Petition, ECF No. 27.  Respondents moved to dismiss Claims Three, Four and Five on grounds of untimeliness.  ECF No. 28.  The undersigned recommended that the motion be granted as to Claims Three and Four but denied as to Claim Five.  ECF No. 33.  The district judge adopted this recommendation.  ECF No. 36.  Respondent filed an answer addressing

---

[2]  Petitioner also filed a petition in the superior court on September 8, 2022, which was denied the following day.  ECF Nos. 29-3, 29-4.

[3]  The delay was caused by repeated judicial reassignments.

Claims One, Two and Five. ECF No. 41. Petitioner did not file a traverse and the time for doing so has expired.

### STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 562 U.S. 86, 99 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529

U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court.  Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011).  The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it.  Id. at 181-182.  In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 182.  Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny.  Richter, 562 U.S. at 102.

DISCUSSION

I.    Claim One: Sufficiency of the Evidence as to Arson

A. Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that his conviction for arson, and therefore also for felony-murder, violates due process.  He contends that accidental causes of fire were not ruled out and there was no evidence to support a conclusion that he intentionally set the fire.  ECF No. 27 at 5.  Relying heavily on the testimony of the fire investigator that neither the cause of the fire nor its precise point of origin could be determined, petitioner argues that the prosecution failed to prove intent beyond a reasonable doubt.  Id. at 7.

B. The Clearly Established Federal Law

Due process requires that each essential element of a criminal offense be proven beyond a reasonable doubt.  In re Winship, 397 U.S. 358, 364 (1970).  In reviewing the sufficiency of

evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer to that resolution." Id. at 326. "A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam).

C. The State Court's Ruling

This claim was raised on direct appeal. Because the California Supreme Court denied discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned decision on the merits and is the subject of habeas review in this court. See Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012); Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991).

The Court of Appeal first addressed two preliminary evidentiary issues raised by petitioner in relation to his challenge to the sufficiency of the evidence: (1) that Investigator Spani's testimony must be disregarded because he did not qualify as an expert, his testimony was limited to the examination of physical evidence he found at the scene, he was not permitted to testify about his opinion on the cause of the fire, and his investigation did not comply with recognized standards; and (2) that petitioner's statements from his pretrial interview with Detective Buck could not be considered because the prosecution had failed to establish the corpus delicti for arson—that the fire was of an incendiary origin—independently of the statements. ECF No. 13-2 at 31. The court rejected both contentions under California law. ECF No. 13-2 at 32-40.

On the merits of the sufficiency of evidence issue, the court ruled as follows:

> We turn now to defendant's contention that there is insufficient evidence as a matter of law to support his conviction in count 2 for arson. Defendant further argues that since there is insufficient evidence for count 2, there is also insufficient evidence to support his conviction in count 1 for felony murder based on arson, and the jury's true finding on the arson-murder special circumstance.

7

### A. Substantial Evidence

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence - evidence that is reasonable, credible and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

"'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

"The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" (*People v. Kraft, supra*, 23 Cal.4th at pp. 1053- 1054.) We "must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

"Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*People v. Zamudio, supra*, 43 Cal.4th at p. 358.)

### B. Section 451

As set forth above, "[a] person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property." (§ 451.)

"Arson's malice requirement ensures that the act is 'done with a design to do an intentional wrongful act ... without any legal justification, excuse or claim of right.' [Citation.] Its willful and malice requirement ensures that the setting of the fire must be a deliberate and intentional act, as distinguished from an accidental or unintentional ignition or act of setting a fire; '"in short, a fire of

incendiary origin.'" [Citations.] 'Because the offensive or dangerous character of the defendant's conduct, by virtue of its nature, contemplates such injury, a general criminal intent to commit the act suffices to establish the requisite mental state.' [Citation.] Thus, there must be a general intent to willfully commit the act of setting on fire under such circumstances that the direct, natural, and highly probable consequences would be the burning of the relevant structure or property. [Citations.]" (*People v. Atkins* (2001) 25 Cal.4th 76, 88-89; *In re V.V.* (2011) 51 Cal.4th 1020, 1029.)

The lack of direct or eyewitness evidence to establish a defendant's guilt does not render a jury's guilty verdict for arson deficient. (*People v. Maler* (1972) 23 Cal.App.3d 973, 982-983.) Arson is generally "committed in stealth, without warning and often under the cloak of darkness," so that "perpetrators of such clandestine acts frequently escape detection by human eye." (*People v. Andrews*, supra, 234 Cal.App.2d at p. 75.) "'The very nature of the crime of arson ordinarily dictates that the evidence will be circumstantial. [Citation.]' [Citation.] Consequently, the lack of an eyewitness placing defendant at the scene or other direct evidence to establish his guilt does not render the jury's verdict of guilty of arson constitutionally deficient. [Citation.]" (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1010.) "Circumstantial evidence may be relied upon to establish culpability for arson. [Citation.]" (*People v. Belton* (1980) 105 Cal.App.3d 376, 379- 380 (*Belton*).)

"[R]evenge and vindictiveness are principal motives for arson [citation]." (*People v. Atkins, supra*, 25 Cal.4th at p. 92.) "A typical arson is almost never the product of pyromania [citations]. Instead, 'it often is an angry impulsive act, requiring no tools other than a match or lighter, and possibly a container of gasoline.' [Citation.] 'Arson is one of the easiest crimes to commit on the spur of the moment ... it takes only seconds to light a match to a pile of clothes or a curtain.' [Citation.]" (*Id.* at pp. 91-92.)

## C. Analysis

Defendant asserts his arson conviction must be reversed because there is insufficient evidence he intentionally and deliberately set the fire since the cause was undetermined, an accident could not be ruled out, and there was no evidence the fire was of an incendiary origin. As explained in issues I and II, *ante*, the People established the corpus delicti of arson and defendant's pretrial statements were admissible, the court did not exclude fire investigator's testimony about his investigation and the fire's area of origin, the expert's testimony about the investigation and various hypotheticals was properly admitted, and both the fire investigator's testimony and defendant's pretrial statements may be considered to determine whether his arson conviction is supported by substantial evidence.

At trial, the People relied on the felony-murder theory of arson arguing defendant hit Villegas in the head with the gun, leaving her unconscious, and starting the fire with the specific intent to kill her because he knew she could identify him.

9

In the defense closing argument, counsel argued the evidence presented three reasonable possibilities about what happened inside room No. 108, and defendant relies on these same theories on appeal: (1) Lee had a motive to set the fire because she was mad at defendant and repeatedly kicked the door to room No. 108; and Lee started the fire by throwing a lit cigarette through room No. 108's window; the window was only a few feet from the bed, and it ignited the bed while defendant was asleep; (2) the fire accidentally started if defendant was smoking a marijuana cigarette and fell asleep, since the unfiltered cigarette would have been consumed by the flames. Defendant admitted he used marijuana, and the fire investigator did not know about the lighter found in the room; or (3) Villegas started the fire because there was more physical evidence that tied her to that room instead of defendant; the lighter and the package of cigarettes were found near her body; she ignited the bed while defendant was asleep because she was upset with him; Villegas likely opened room No. 108's door when the fire started even though she was not shown on the security video; she had a potentially toxic level of methamphetamine in her system that could have made her disoriented; she was too confused to run out and instead went back into the bathroom, fell down, hit her head on one of the surfaces, and was left unconscious while the fire consumed the room. Counsel discounted the argument that defendant used the gun to hit Villegas on the head, since defendant would have likely put the gun in his pocket, the gun was found in Villegas's purse, and there were no unique marks to connect the gun to the head injuries.

There is strong and, indeed, overwhelming evidence, albeit of a circumstantial nature, that defendant intentionally set the fire inside room No. 108. The small room measured approximately 10.5 feet by 16.5 feet. There was one door and one window that were under constant video surveillance for the relevant time. There were only two people inside the room when the fire started - defendant and Villegas. Defendant was the only person who emerged from the room after the fire started and he initially acted without any sense of urgency.

Defendant repeatedly claimed in his pretrial statement that he did not know Villegas and had no idea she was in the room. The motel manager refuted this assertion, and testified defendant told him someone was going to rent a room for him. The manager identified Villegas as the woman who later arrived at the motel and said she was getting a room for J-Rock, using defendant's nickname. While the manager said Villegas used another name, he positively identified Villegas from her photograph. The manager gave her the cardkey to room No. 108, and she paid for a second night. A few hours before the fire, defendant arrived at the motel, paid for yet another night for that same room, and the manager gave him a cardkey to room No. 108.

Defendant asserts his actions as seen on the motel's security video are insufficient to support his conviction, even considering his conduct after he opened the door and the heavy smoke came out of room No. 108. To the contrary, the most compelling evidence

against defendant was the security video, which we have extensively addressed in the factual statement.[4] It shows defendant and Villegas knew each other, they talked, they walked into room No. 108 together, they were in the room when the fire started, and Villegas never left the room.

The video also showed that after Villegas went into room No. 108, and prior to the fire, defendant came out of the room and talked with Lee in the driveway. Defendant and Lee clearly knew each other and had what appeared to be a heated conversation. Defendant went into room No. 108, closed the door, and did not emerge again until after the fire started. Lee went in and out of room No. 109, stood in front of both rooms, knocked and kicked on room No. 108's door, knocked on the window, and tried to look into the window and open it. While defendant argued at trial, and on appeal, that Lee may have started the fire by throwing something into room No. 108, the video showed Lee never went inside the room; she never opened the room's door or window; and she did not appear to push or throw anything through the window.

Neither Lee nor anyone else was standing outside room No. 108 when defendant ultimately opened the door, smoke poured out of the room, and he walked onto the doorstep. Defendant calmly stood in front of the open door with his hands in his pockets as smoke continued to billow out. He did not knock on the doors of any adjacent rooms, use a phone to call for help, or appear to shout or yell for assistance. Instead, he just stood there as the smoke poured out of the room and surrounded him. At some point, defendant turned, looked inside, went back into the room, and emerged with a burning blanket, and then went back and dragged out a burning sheet. He shook both items and stamped out the flames on the driveway pavement. Defendant did not appear to act with any urgency, and he still did not go to any of the motel rooms to ask for help or appear to call out in any way.

Defendant made another attempt to go into the room but was apparently pushed back by the flames and smoke. At that point, he left room No. 108 and disappeared from the video, just as other people arrived at burning room as flames shot out of the doorway. After defendant left, Lee and the other occupants of room No. 109 ran out of their room, and Lee also disappeared from the video. Another security camera showed defendant and Lee driving away from the motel. Defendant did not talk to the police or firefighters or notify them that another person was in the room.

The fire investigator determined the fire's area of origin was the bed. The bed had been pulled away from the wall, the mattress had been moved so that it was at an angle on top of the box spring, and the gun and Villegas's purse were found at the base of the box spring near the wall. It was entirely reasonable for the jury to conclude that defendant suddenly went back into the room in an effort to retrieve the gun, that he moved the mattress and box spring and dragged the burning sheet and blanket outside to look for the

---

[4] See ECF No. 13-2 at 5-11 (detailing surveillance video evidence).

weapon. The gun and perhaps the purse could have fallen off the burning bed when he did so.

Defendant argues the People improperly relied on a speculative argument that he set the fire, based on the allegedly false premise that Villegas was rendered unconscious from the blows to her head before the fire started. Defendant asserts the pathologist could not determine "with any degree of reasonable medical certainty" that Villegas was unconscious when the fire started, and it was possible she could have started the fire. The evidence belies these assertions. Villegas's body was found in the small bathroom in the back of room No. 108. There was no evidence that the fire started in the bathroom, or that it even burned there. Villegas's clothing had not been burned or singed, and there was no evidence she had been dragged in or out of the bathroom. Villegas had suffered three separate blows to the back of her head that were inflicted by a blunt object. The pathologist testified that she was alive when she was assaulted based on the bleeding from the back of her head, and opined it was possible these blows left her unconscious.

The pathologist further testified that while there were no specific patterns on the back of her head, it was "possible" the three blows were inflicted with the butt of the gun found in the room, since the butt was a blunt object with a linear shape.

Detective Buck testified the dimensions of the gun's handle were consistent with the size of each laceration on the back of Villegas's head, and he did not find anything else in the bathroom that looked consistent with having inflicted those injuries. Again, defendant and Villegas were the only people in that room, and the circumstantial evidence points to defendant as the perpetrator of both the assault and the fire.

Defendant asserts the potentially toxic level of methamphetamine in Villegas's system was a possible cause of death. The defense expert testified Villegas could have been left unconscious because of her methamphetamine use, but the pathologist testified she was still alive when she was hit on the head and also when the fire started. He testified that she died from smoke inhalation based on the soot in her respiratory system, and further testified, without contradiction, there would not have been any soot in her respiratory system if she was dead before the fire started.

Defendant makes much of the fire inspector's failure to determine the fire's specific point of origin, and the court's agreement - pursuant to the stipulation of the parties - to limit his testimony so that he could not testify to an opinion as to whether the cause was incendiary. As explained in issue I, ante, the fire inspector was properly allowed to testify about his inspection of the room and the investigation of the burned contents, and the jury was properly instructed on the consideration of his testimony. He determined the fire's area of origin was the bed, a flashover event occurred, and the flashover would have been exacerbated when the door was opened because of the additional oxygen. The material covering the mattress and box spring was almost completely consumed by fire,

and they were burned down to the springs. The other items in the sleeping area - the tires and rims, the dresser, and the speaker box - showed the most fire damage on the sides that faced the bed. The fire investigator ruled out an accidental cause from the electrical appliances and outlets. He found no evidence of cigarette butts in the sleeping area and explained that a cigarette butt would not have been completely destroyed, even in a flashover event.

Defendant complains the fire investigator's testimony was unreliable because he did not know about the Bic lighter, the pack of cigarettes, and the cigarette butt found in the bathroom. Defendant further argues that evidence leads to the reasonable inference the fire was accidental, and was started by a smoldering, unfiltered cigarette that he left on the bed when he fell asleep. Defendant asserts this theory is consistent with the fire investigator's failure to rule out an accidental fire; a marijuana unfiltered cigarette would have been consumed by the fire; and defendant said in his pretrial statement that he was "smoking marijuana."

Defendant's arguments are refuted by the evidence. The fire investigator acknowledged that in contrast to a filtered cigarette, an unfiltered or marijuana cigarette would have been completely consumed by the fire. He did not know a lighter and a cigarette butt had been found anywhere in room No. 108. However, the evidence is undisputed that the package of filtered cigarettes and the only cigarette butt were found inside a plastic bag that was recovered from the top of the toilet in the bathroom, and there was no evidence that the fire started or even burned in the bathroom.

Moreover, the fire investigator's admission that he did not know about the cigarette butt and the lighter is far outweighed by the importance of defendant's own statements during his pretrial interview with Detective Buck. In contrast to defendant's appellate arguments, there was no evidence defendant was smoking marijuana or anything else in the room before the fire started, and he repeatedly denied engaging in any activities that could have accidentally started the fire.

During the pretrial interview, Detective Buck asked defendant about his drug use. Defendant said he used cocaine and smoked marijuana "every now and then," and the following exchange ensued:

"Buck: On Saturday, *before you went to bed, before all this happened*, did you use?

"[Defendant]: *No sir.*

"Buck: No weed?

"[Defendant]: *Yea I smoked some weed.*

"Buck: How much did you smoke?

"[Defendant]:  Um bout normal?

"Buck:  Normal? I mean.

"[Defendant]:  Normal like 4-5 blunts.

"Buck:  4-5 blunts? That's normal for you?

"[Defendant]:  Not yeah not like back to back to back like.

"Buck:  Throughout the night?

"[Defendant]:    *Through the day*." (Italics added, capitalization omitted.)

Defendant further said that he did not smoke in the room, and he "didn't even have a lighter." (Capitalization omitted.) Defendant claimed he "passed out" and fell asleep in room No. 108 while waiting for someone and had no idea how the fire started. Defendant's own statements thus undermine any claim that he used a lighter or smoked a marijuana cigarette when he was in room No. 108 before the fire started.

Defendant argues the People failed to prove beyond a reasonable doubt that he was the perpetrator. Defendant asserts "it is equally reasonable, and more consistent with the evidence," to infer Villegas started the fire in retaliation for being hit in the head by defendant, that she used the Bic lighter to ignite the bedding, that she retreated to the bathroom with the lighter and became unconscious either because of her methamphetamine use or from smoke inhalation. Defendant asserts this theory is more reasonable since it is consistent with the discovery of the Bic lighter near Villegas's body and his "uncontradicted statements" during the pretrial interview "that he was sleeping on the bed when the fire started." Defendant further argues the motel's security video "confirmed much" of what he said during the pretrial interview - that he ran out of the door and began asking for help.

As set forth above, defendant's statements during the pretrial interview, particularly his repeated claim that he did not know Villegas or how she got into his room, are inculpatory and are completely undermined by the contrary visual evidence from the security video and by the motel manager's testimony that Villegas said she was renting a room for defendant, and defendant later arrived and was given the key to room No. 108. The video clearly showed Lee never got into the room or warned him about the fire.

Finally, defendant argues that even if his own pretrial statements are considered, they are still insufficient to support his arson conviction:

"There could be a variety of reasons why [defendant] would not want to implicate someone else in this crime. However, his failure to implicate someone else does not implicate him. In other words, the fact that [defendant] did not tell police

14

that someone else set the fire does not prove he set the fire. Simply pointing to an absence of evidence is not proof of absence. This reasoning ... is known as an ... argument from ignorance, in which the prosecution used an absence of evidence for an asserted premise as proof of the opposite premise; i.e., [defendant] must have started the fire because he didn't say, and we couldn't prove, anyone else did it. This is not proof beyond a reasonable doubt."

In making these arguments, defendant acknowledges this court cannot reweigh the evidence, but still asserts there was "at most" a "coin flip" or "50 percent probability" that he started the fire and it was of an incendiary origin, which is insufficient to support a conviction.

However, "[w]here, as here, the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, 'but our opinion that the circumstances also might reasonably be reconciled with a contrary finding' does not render the evidence insubstantial. [Citation.]" (*People v. Earp* (1999) 20 Cal.4th 826, 887-888.) Defendant's appellate assertions are "arguments to be made to a jury, not to an appellate court. Defendant in effect requests us to reweigh and reinterpret the evidence in a manner consistent with innocence of the crime .... But such a determination is the function of the trier of fact; at this stage the test is not whether the evidence may be reconciled with innocence, but whether there is substantial evidence in the record on appeal to warrant the inference of guilt drawn by the trier below. [Citation.]" (*People v. Saterfield* (1967) 65 Cal.2d 752, 759; *People v. Gaulden* (1974) 36 Cal.App.3d 942, 962-963.) "'If such substantial evidence [is] found, it is of no consequence that the [trier of fact] believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.' [Citation.]" (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1363.)

We find defendant's conviction for arson is supported by substantial evidence. As a result, we similarly reject his related arguments that his conviction for felony murder based on arson and the jury's true finding on the arson-murder special circumstance must be reversed.

ECF No. 13-2 at 41-51.

D.    Objective Reasonableness Under § 2254(d)

The state court's rulings on the preliminary evidentiary issues related to Inspector Spani's testimony and petitioner's pretrial statements are not subject to review in this court. Evidentiary matters are exclusively issues of state law, see Estelle v. McGuire, 502 U.S. 62, 67 (1991), and this court must defer to state court rulings on state law matters, Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (federal habeas court is bound by a state court's interpretation of state law).

1    Accordingly, this court's review of petitioner's <u>Jackson</u> claim proceeds on the basis of the entire

2    evidentiary record considered by the state court.

3        The California standards for substantial evidence review recited by the Court of Appeal,

4    ECF No. 13-2 at 41-42, comport fully with <u>Jackson</u> and progeny.  <u>See</u> <u>Early v. Packer</u>, 537 U.S.

5    3, 8 (2002) (even where state court fails to cite federal authority, its decision must be upheld "so

6    long as neither the reasoning nor the result of the state-court decision contradicts" clearly

7    established United States Supreme Court authority).  The undersigned finds that these standards

8    were applied reasonably.  The California Court of Appeal was not merely permitted but required

9    by U.S. Supreme Court precedent to defer to the jury's inferences as to the existence of an

10   "incendiary event," petitioner's responsibility for setting the fire, and his intent.  <u>See</u> <u>Jackson v.</u>

11   <u>Virginia</u>, 443 U.S. at 326 (where evidence supports conflicting inferences, reviewing court must

12   presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the

13   court must "defer to that resolution."); <u>see also</u> <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274, 1275 & n.

14   13 (9th Cir. 2005).  It did so entirely in line with clearly established federal law.

15       That a competing theory of the evidence can also be articulated does not make the jury's

16   conclusion irrational, as petitioner urges.  <u>See</u> <u>Cavazos</u>, 565 U.S. at 2 (standard is whether any

17   rational trier of fact could have agreed with the jury, not whether an alternative theory was also

18   supported by evidence and permissible inferences); <u>see also</u> <u>United States v. Toro-Barboza</u>, 673

19   F.3d 1136, 1145 (9th Cir. 2012) (<u>Jackson</u> satisfied where there is "a plausible chain of logic to

20   support the jury's verdict").  It is indisputable that a conviction may rest entirely on

21   circumstantial evidence and inferences drawn from it.  <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th

22   Cir. 1995).  The inferences drawn by the jury from the evidence in this case, regarding both

23   causation and intent, are no less rational than those which were held constitutionally sufficient to

24   support a murder verdict in <u>Cavazos</u>, <u>supra</u>.  In that case a grandmother was convicted of the

25   murder of her infant grandchild on a "shaken baby" theory, despite the absence of any direct

26   evidence of child abuse or homicide; the defense case was significantly stronger in that case than

27   here.  If the conviction in <u>Cavazos</u> survives federal habeas scrutiny under <u>Jackson</u>, which the U.S.

28   Supreme Court said that it does, petitioner cannot prevail on the facts of this case.  Particularly in

1    light of the "double dose of deference" to the verdict that is required under Jackson and the

2    AEDPA, Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011), federal habeas relief is

3    unavailable.

4        II.    Claim Two: Ineffective Assistance of Counsel

5            A.    Petitioner's Allegations and Pertinent State Court Record

6        Petitioner alleges that his trial counsel provided constitutionally defective representation

7    by failing to object to the prosecutor's closing argument regarding reasonable doubt.  ECF No. 27

8    at 9-11.  In closing, the prosecutor reviewed the details of petitioner's pretrial statements about

9    how he discovered the room was on fire, and argued that his version was refuted by the security

10    video and other evidence.  She continued:

11            There is not a reasonable doubt as to who started the fire. And
            ultimately, that's what we care about in a criminal case, reasonable
12            doubt. [The court] told you, and you have to accept this, anything in
            life is possible or subject to imaginary doubt. You can imagine any
13            kind of way that this fire started, but we only care about, in a
            criminal case, a reasonable explanation.
14
            There's no reasonable explanation for this fire. And if there's no
15            reasonable explanation, you have no reasonable doubt as to how the
            fire started. Remember that. It's about reasonableness….
16
            There's not a reasonable explanation, but for this man had to get rid
17            of a problem and he set a fire, watched it grow, and then took off
            and then lied about it, and it killed [Villegas].
18

19    5 RT 1031-1032 (ECF No. 39-10 at 81-82).

20        After addressing the evidence in support of felony-murder and the arson-murder special

21    circumstance, she returned to reasonable doubt:

22            Now, I want to tell you one more time, in a criminal case, we're
            only talking about reasonable doubt. You've probably heard maybe
23            on TV or, you know, talking to your friends, you've probably heard
            phrases like "beyond a shadow of a doubt," "without any possible
24            doubt," "100 percent certainty." Those are not things we care about
            in a criminal case. The Judge told you, you have to accept as true
25            everything in life is subject to imaginary doubt. So that's why we
            only care about what's reasonable. And that's where you get to use
26            your collective common sense, your collective minds. Think about
            what's reasonable.
27
            If there's no reasonable explanation for this fire, other than this man
28            set the fire to get rid of his problem, and [Villegas] died in that fire,

                                17

> there's no reasonable doubt. So when you're deliberating together … keep that in mind. Say to yourselves … [w]e care about what's reasonable. Not about what's imaginary or what's possible. We don't care about what's possible. If it's not reasonable, you have no reasonable doubt in the case.

5 RT 1037 (ECF No. 39-10 at 87).

The prosecutor referred the jury to the court's instruction on reasonable doubt and added, "the evidence need not eliminate all possible doubt. There's no reasonable explanation."

5 RT 1038 (ECF No. 39-10 at 88).

Defense counsel argued in closing that the prosecution had failed to meet its burden of proving the charges beyond a reasonable doubt, which was a very high burden. Counsel extensively addressed the definitions of the presumption of innocence and reasonable doubt in the jury instructions, and argued the jury had to find petitioner was not guilty. Counsel argued that the prosecutor was relying on assumptions and not evidence about what happened. He emphasized the absence of physical or direct evidence that petitioner intentionally set the fire, and cautioned the jury against relying on circumstantial evidence to reach unsupported conclusions.

In rebuttal, the prosecutor again reviewed the evidence and argued that only defendant could have hit Villegas in the head and started the fire. She contended that although defense counsel had suggested "possible" scenarios of what happened,

> We don't care about what's possible. We care about what's reasonable. That's why the Judge read you the reasonable doubt instruction more than one time. It's not reasonable that [Villegas] bashed herself in the head three times and lay on the bathroom floor. That's not reasonable. It's not reasonable, after watching the video of [Lee], to think that she managed to get a cigarette in there. It's not reasonable to think that this was an accidental fire based on the fact that there was nothing left that would have started the fire. No cigarette filter. Those survive…. [¶] None of those are reasonable. That means you have no reasonable doubt in this case.

5 RT 1068-1069 (ECF No. 39-10 at 118-119).

## B. The Clearly Established Federal Law

To establish a constitutional violation based on ineffective assistance of counsel, a petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense. Strickland v.

<u>Washington</u>, 466 U.S. 668, 692, 694 (1984).  Prejudice means that the error actually had an adverse effect on the defense.  There must be a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  <u>Id.</u> at 693-94.  The court need not address both prongs of the <u>Strickland</u> test if the petitioner's showing is insufficient as to one prong.  <u>Id.</u> at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  <u>Id.</u>

          C.  <u>The State Court's Ruling</u>

      This claim was raised on direct appeal, and the opinion of the California Court of Appeal is therefore the subject of federal habeas review.  <u>See</u> Ortiz, 704 F.3d at 1034.

      The appellate court ruled in pertinent part as follows:

> Defendant contends the prosecutor misstated the People's burden of proof in closing argument by comparing it to whether defendant gave a reasonable explanation for his actions. Defendant concedes defense counsel did not object to the prosecutor's argument, and asserts counsel was prejudicially ineffective for failing to do so.

> We review the well-settled standards for prosecutorial misconduct, and the portions of the prosecutor's argument relied upon by defendant.

> **A. Prosecutorial Misconduct**

> "A prosecutor's misconduct violates the Fourteenth Amendment to the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct 'that does not render a criminal trial fundamentally unfair' violates California law 'only if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'[Citations.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 242.)

> "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citations.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (Centeno).) The court must consider the challenged statements in the context of the argument as a whole to make its determination. (*People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159.)

**B. Failure to Object**

"[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation]." (*People v. Marshall* (1996) 13 Cal.4th 799, 831; *Centeno, supra*, 60 Cal.4th at pp. 665-667 .)

"A prosecutor's misstatements of law are generally curable by an admonition from the court. [Citation.]" (*Centeno, supra*, 60 Cal.4th at p. 674.) "As a general rule, '"[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety."' [Citations.] The defendant's failure to object will be excused if an objection would have been futile or if an admonition would not have cured the harm caused by the misconduct. [Citation.]" (*Ibid.*)

Defendant concedes his attorney did not object to any portion of the prosecutor's closing argument. As a result, he has forfeited his direct challenge based on prosecutorial misconduct.

**C. Ineffective Assistance**

In the alternative, defendant asserts counsel was prejudicially ineffective for failing to do so. "'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' [Citation.] ... [Defendants] bear[] the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice. [Citations.]" (*Centeno, supra*, 60 Cal.4th at p. 674, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.)

**D. The Prosecutor's Closing Argument**

[….]⁵

**E. *Centeno* and *Cortez***

Defendant argues that in the italicized excerpts quoted above, the prosecutor misstated the reasonable doubt standard by equating it to whether there was a reasonable explanation for what happened in the case, and that such argument erroneously diluted the People's burden of proof.

Defendant's arguments are based on *Centeno, supra*, 60 Cal.4th

---

⁵ The pertinent portions of closing arguments, all quoted by the Court of Appeal, have been set forth above under the heading of Petitioner's Allegations and Pertinent State Court Record.

659, where the California Supreme Court reversed the defendant's convictions after finding the prosecutor misstated the burden of proof in rebuttal argument. In that case, the defendant was convicted of multiple offenses for sexually assaulting a seven-year-old child, who gave inconsistent testimony and refused to answer many questions at trial. (*Id.* at pp. 662-664.) On appeal, the defendant argued the prosecutor committed prejudicial misconduct by misstating the burden of proof in rebuttal argument. The defendant conceded that his attorney failed to object and raised ineffective assistance as an alternative argument. (Id. at p. 674.)

*Centeno* held the prosecutor misstated the burden of proof in two separate instances in rebuttal argument.

**1. Visual Display**

[Omitted.]

**2. Whether the Prosecution's Theory was "Reasonable"**

*Centeno* separately held the prosecutor misstated the burden of proof in another section of rebuttal argument when she "strongly implied that the People's burden was met if its theory was 'reasonable' in light of the facts supporting it." (*Centeno , supra*, 60 Cal.4th at p. 671.)

[....]

**3. Prejudice**

*Centeno* held defense counsel was ineffective for failing to object to both the prosecutor's use of the diagram and the hypothetical, and also her argument about a reasonable interpretation of the evidence, because both "problems with the prosecutor's argument were not difficult to discern," and counsel required "no authority ... to conclude that the prosecutor's argument urging the jury to convict based on a reasonable account of the evidence misstated the burden of proof." (*Centeno, supra*, 60 Cal.4th at p. 675.)

*Centeno* held the defense counsel's failure to object was prejudicial because it was "reasonably likely" that the jury was misled by both the prosecutor's visual image in the diagram and accompanying hypotheticals, and her argument about a reasonable interpretation of the evidence, particularly since the errors occurred during rebuttal and prevented defense counsel from countering the argument. (*Centeno, supra*, 60 Cal.4th at pp. 674- 676.)

[....]

**4. *Cortez***

In *People v. Cortez* (2016) 63 Cal.4th 101 (*Cortez*), the defendant was convicted of murder and attempted murder for shooting victims from a car. In rebuttal argument, the prosecutor said: "'The court told you that beyond a reasonable doubt is not proof beyond all

doubt or imaginary doubt. Basically, I submit to you what it means is you look at the evidence and you say, "I believe I know what happened, and my belief is not imaginary. It's based in the evidence in front of me."'" Defense counsel objected and, before the court responded, the prosecutor added, "'That's proof beyond a reasonable doubt.'" The court then overruled the objection. (*Id.* at p. 130.)

In *Cortez*, a majority of the California Supreme Court rejected the defendant's argument that the prosecutor diluted the burden of proof. Cortez held "the challenged remarks, viewed in isolation, were incomplete at best," (*Cortez, supra*, 63 Cal.4th at p. 131) and when the remarks were viewed in context, there was no reasonable likelihood the jury would misunderstand the burden of proof. The majority found it significant that defense counsel emphasized the People's burden of proof in closing argument, the jury was properly instructed on reasonable doubt prior to closing argument, and the court submitted the written instruction to the jury for deliberations. (Cortez, supra, 63 Cal.4th at pp. 131-133.) "As we have explained, '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (*Id.* at p. 131 .) In reaching these conclusions, the majority opinion did not address *Centeno*. (*Cortez*, at pp. 130-133.)

A concurring opinion was filed in *Cortez*, wherein Justice Werdegar (joined by Justices Liu and Cuellar) relied on *Centeno* and wrote that the prosecutor similarly misstated the burden of proof by saying that reasonable doubt meant that "' ... you look at the evidence and you say, "I believe I know what happened, and my belief is not imaginary. It 's based in the evidence in front of me." ... That's proof beyond a reasonable doubt.'" (*Cortez, supra*, 63 Cal.4th at p. 134 (conc. opn. of Werdegar, J.), italics added in original.) Justice Werdegar compared the prosecutor's argument in *Cortez* to the same language disapproved in *Centeno* about a reasonable account of evidence, because it "reversed the standard of proof beyond a reasonable doubt, telling the jury that their belief in guilt need only be nonimaginary, rather than that the evidence must exclude all reasonable doubts." (*Cortez*, at p. 134 (conc. opn. Of Werdegar, J.) .)

However, Justice Werdegar agreed with the majority's conclusion that any error was not prejudicial. (*Cortez, supra*, 63 Cal.4th at p. 136 (conc. opn. Of Werdegar, J.).)

"The contextual factors the majority brings forward are, however, persuasive as to the lack of prejudice from this prosecutor's misstatement of the law. The prosecutor's isolated misstatement clearly was not so extensive and egregious as to render the trial fundamentally unfair, infringing on defendant's federal due process rights. The misstatement violated only California law against the use of deceptive methods in jury argument, making it subject only to the prejudice standard generally applicable to state law trial errors, whether a reasonable probability exists the error affected the jury's verdict. [Citations.] Consequently, for the same reasons the

22

majority finds no reasonable likelihood 'the jury construed or applied the prosecution's challenged remarks in an objectionable fashion' [citation], I would find no reasonable probability the prosecutor's misstatement of the law affected the jury's verdict." (*Id.* at pp. 135- 136 (conc. opn. of Werdegar, J.).)

**F. Analysis**

Based on *Centeno*, we are compelled to find the prosecutor misstated the reasonable doubt standard in the portions of closing and rebuttal argument quoted above, by improperly equating whether there was a reasonable explanation for the fire with the People's burden of proof beyond a reasonable doubt: "If there's no reasonable explanation for this fire, other than this man set the fire to get rid of his problem, and [Villegas] died in that fire, there's no reasonable doubt. So when you're deliberating together . .. keep that in mind. Say to yourselves ... [w]e care about what's reasonable. Not about what's imaginary or what's possible. We don't care about what's possible. If it's not reasonable, you have no reasonable doubt in the case." (Italics added.)

As explained in *Centeno*, "it is error for the prosecutor to suggest that a 'reasonable' account of the evidence satisfies the prosecutor's burden of proof." (*Centeno, supra*, 60 Cal.4th at p. 672.) In doing so, the prosecutor improperly "confounded the concept of rejecting unreasonable inference, with the standard of proof beyond a reasonable doubt [and] repeatedly suggested that the jury could find defendant guilty based on a 'reasonable' account of the evidence. These remarks clearly diluted the People's burden." *(Id.* at p. 673.)

In contrast to *Centeno*, however, the prosecutor's misstatement was harmless beyond a reasonable doubt and there is no reasonable probability that defense counsel's failure to object impacted the verdict. (*Centeno, supra*, 60 Cal.4th at pp. 674- 677.) *Centeno*'s assignments of error were based on the prosecutor's misconduct both by using the improper diagram and hypotheticals and misstating the burden of proof. In contrast, the prosecutor in this case did not project an objectionable diagram or hypotheticals that were critical to the decision in *Centeno*.

As in *Cortez*, the court properly instructed the jury about the People's burden of proof, and defense counsel extensively argued the People failed to meet that burden in this closing argument. In addition, both the prosecutor and defense counsel referred the jury to the reasonable doubt instruction which the court had already read to them.

More importantly, as we have already explained above, this case is not similar to the "very close case" that existed in *Centeno* where there was no physical evidence, the minor denied the event at trial, the minor's father corroborated the defendant's denials, and the prosecutor "depended almost entirely on [the victim's] credibility, which was called into question in several respects." (*Centeno, supra*, at p. 677.) Instead, the motel's security camera clearly showed defendant and Villegas knew each other; only defendant

23

and Villegas were in the room together when Villegas was hit in the head, likely left unconscious, and the fire started; defendant, contrary to his pretrial claims, did not attempt to save her in any way from the conflagration that consumed the small motel room; and the pathologist testified without contradiction that Villegas was still alive when she was hit in the head and when the fire started. While there was no eyewitness who saw defendant hit Villegas and start the fire, the circumstantial evidence was undisputed and extremely strong. This case is further distinguished from *Centeno* since the various defense theories of the case lacked virtually any supporting factual basis, the cause of Villegas's death was also undisputed, and the direct evidence presented on the security video was also undisputed - that defendant and Villegas knew each other, they were the only two people in the room, and Lee never got inside the room or threw anything into the window.

ECF No. 13-2 at 60-72.

### D. Objective Reasonableness Under § 2254(d)

The California appellate court found that there was no ineffective assistance because, although the prosecutor did misstate the burden of proof, her error was harmless beyond a reasonable doubt. Accordingly, defense counsel's failure to object cannot have prejudiced petitioner. ECF No. 13-2 at 71 ("… there is no reasonable probability that defense counsel's failure to object impacted the verdict."). There is nothing objectively unreasonable about this conclusion. It is fully consistent Strickland to deny an ineffective assistance claim without consideration of counsel's performance where the challenged act or omission had no likely effect on the outcome of the trial. Strickland, 466 U.S. at 697.

In evaluating prejudice, the state court reasonably relied on the facts that the jury was correctly instructed on the reasonable doubt standard, that both counsel expressly referred the jury to those instructions, and that defense counsel vigorously argued the reasonable doubt issue. Jurors were also instructed that "[i]f you believe that the attorney's comments on the law conflict with [the court's] instructions, you must follow [the court's] instructions." 2 CT 489 (ECF No. 39-2 at 21). These circumstances negate any likelihood that the jurors gave undue weight to the prosecutor's misstatements. The state court also properly considered the impact of the prosecutor's statements in light of the trial evidence as a whole. The state of that evidence, which was thoroughly reviewed and reasonably evaluated, further negates any likelihood that the verdict was based on application of an erroneous understanding of the reasonable doubt standard. This

24

1    was not an objectively unreasonable conclusion on the part of the appellate court.  Accordingly,

2    federal habeas relief is unavailable on this claim.

3        III.     Claim Five: Cumulative Error

4            A.  Petitioner's Allegations and Pertinent State Court Record

5         Claim Five alleges that his right to due process was violated by the cumulative effect of

6    the asserted trial errors.  ECF No. 27 at 18.  This claim has previously been limited to the

7    cumulative effects of the errors alleged in Claims One and Two.  ECF No. 33 at 5; ECF No. 36.

8            B.  The Clearly Established Federal Law

9         Multiple errors that are harmless individually may be so prejudicial that they rise to the

10   level of a due process violation.  See Chambers v. Mississippi, 410 U.S. 284, 290 n. 3 (1973).

11           C.  The State Court's Ruling

12        This claim was denied in state habeas.  ECF Nos. 29-1, 29-2.  In denying the petition, the

13   California Supreme Court cited People v. Duvall, 9 Cal. 4th 464, 474 (1995) and In re Swain, 34

14   Cal. 2d 300, 304 (1949).  ECF No. 29-2.

15           D.  The Claim is Meritless

16        This court need not consider whether the state court's citations to Duvall and Swain create

17   a procedural bar to federal relief,[6] because defaulted federal claims may be denied on the merits.

18   See Lambrix v. Singletary, 520 U.S. 518, 523-25 (1997).  It is elementary that where no error of

19   constitutional magnitude has occurred, no cumulative prejudice is possible.  Hayes v. Ayers, 632

20   F.3d 500, 525 (9th Cir. 2011).  Because the evidence was sufficient to support the verdict, and

21   petitioner has not established any other trial error of constitutional magnitude, there is nothing to

22   cumulate with defense counsel's failure to object to the prosecutor's misleading statements in

23   closing argument.  Accordingly, petitioner's cumulative error claim necessarily fails under any

24   standard of review.

25   ////

26   ////

27

28   ───────────────
     [6]  See Coleman v. Thompson, 501 U.S. 722 (1991).

CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 20, 2025

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE